UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

STEPHEN WILSON,                                    **24 CV**

              Plaintiff,                        **COMPLAINT**

    -against-                                   **JURY TRIAL DEMANDED**

YONKERS PUBLIC SCHOOLS,
WILLIAM SHAGGURA, individually and on
behalf of Yonkers Public Schools,
DR. EDWIN M. QUEZADA, individually and on
behalf of Yonkers Public Schools, and JAMIE
MORALES, individually and on behalf of
Yonkers Public Schools,

              Defendants.
-------------------------------------------------------------X

      STEPHEN WILSON (hereinafter "Plaintiff") by his attorneys Stewart Lee Karlin Law Group, PC, complaining of Defendant, YONKERS PUBLIC SCHOOLS (hereinafter "Defendant"), alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.   This is a civil action based upon Defendants' violations of Plaintiff's rights guaranteed to him by: (i) the race, national origin and gender discrimination and retaliation provisions of the Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (ii) the race discrimination and retaliation provisions of 42 U.S.C. § 1981 ("Section 1981"); (iii) the race, national origin and gender discrimination and retaliation provisions of the New York State Human Rights Law, New York State Executive Law, § 296 et seq. ("NYSHRL"); (iv) and (vi) any other claim(s) that can be inferred from the facts set forth herein.

2.   Plaintiff seeks redress for the injuries he has suffered as a result of his employer's

discrimination and retaliation solely on the basis of his race (Black).

## JURISDICTION AND VENUE

3.  Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§1331 and 1343.

4.  The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. §1367.

5.  Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York. 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

6.  Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") upon which this Complaint is based.

7.  Plaintiff received a Notice of Right to Sue from the EEOC dated October 18, 2023, with respect to the instant charges of discrimination.  A copy of the Notice is annexed to this Complaint as Exhibit "A".

8.  This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

9.  In addition, Plaintiff filed a notice of claim, and a 50-H hearing has been held.

## PARTIES

10.  At all times hereinafter mentioned, Plaintiff STEPHEN WILSON (hereinafter mentioned as "Plaintiff or "Mr. Wilson"), resides within the State of New York. Plaintiff is an employee as defined by the Title VII and the New York State Executive Law 291 et. seq.

11.  Defendant Yonkers Public Schools (hereinafter "the District") is a political subdivision of the State of New York by law with responsibility for the operation, management, and

control of Yonker's public education.  Defendant is within the jurisdiction of this Court, with its principal place of business located in Westchester County.

12.   Defendant William Shaggura was a Principal at Yonkers Public Schools as was acting individually and on behalf of Yonkers Public Schools at all times relevant in the complaint. Defendant Shaggura is an aider and abettor under the NYSHRL.  N.Y. Exec. Law. § 296(6).

13.   Defendant Dr. Edwin M. Quezada was the Superintendent at Yonkers Public Schools as was acting individually and on behalf of Yonkers Public Schools at all times relevant in the complaint. Defendant Quezada is an aider and abettor under the NYSHRL.  N.Y. Exec. Law. § 296(6).

14.   Defendant Jamie Morales was a Principal at Yonkers Public Schools and was acting individually and on behalf of Yonkers Public Schools at all times relevant in the complaint. Defendant Morales is an aider and abettor under the NYSHRL.  N.Y. Exec. Law. § 296(6).

15.   At all relevant times, Defendant is an "employer" as defined in Section 701(b) of Title VII of the Civil Rights Act of 1964 42 USC § 2000e.  As such, Defendant is subject to the requirements of Title VII (42 USC § 2000e et seq.).  Defendant is also employer within the meaning of the New York State Executive Law (NYSHRL).

## FACTUAL STATEMENT

16.   Plaintiff is African American, subjected to ongoing race discrimination and retaliation as set forth below.

17.   Mr. Stephen Wilson [Mr. Wilson] is a 48-year-old male.

18.   Mr. Wilson identifies as Black/African American/Jamaican/West Indian.

19.   Mr. Wilson was hired by Defendant as a per diem substitute teacher in 2015 and was then hired as an ELA Teacher at Charles E. Gorton High School in 2016 where he currently

works.

20. Mr. Wilson is the only Black male teacher in the ELA Department at Charles E. Gorton High School.

21. The ELA Department at Gorton High School is comprised of all White Female teachers.

22. For the past several years, Mr. Wilson received the rating of highly effective, but this rating was lowered to effective after he filed his EEOC complaint.

23. Mr. William Shaggura became the probationary principal of Gorton High School around 2017 and received his tenure/notice of tenure around May of 2021.

24. The following assistant principals observed/supervised Mr. Wilson: Ms. Williams, Mr. James, Dr. Thiam, and Mr. Grandoit.

25. Mr. William Shaggura has never observed Mr. Wilson at Gorton.

26. Mr. William Shaggura discriminated against Mr. Wilson based on Mr. Wilson's race, national origin, and gender.  Mr. Shaggura's discrimination took the form of disparate and unequal treatment in terms of class assignments, duties, accommodations, and opportunities to gain overtime pay, compensation for duties performed outside contractual work time, and opportunities for career advancement.

**2019-2020 SCHOOL YEAR**

27. In around June of 2019, Mr. Shaggura told Mr. Wilson that Mr. Wilson would be teaching grade 12 and 10 during the 2019-2020 school year.

28. Mr. Shaggura told Mr. Wilson that if he took on Ms. Landsman's coverage management duties, Mr. Wilson would only receive 4 teaching periods. Consequently, Mr. Wilson agreed.

29. However, Mr. Shaggura did not keep his promise. For the 2019-2020 school year, Mr.

4

Wilson was assigned five teaching periods, not four periods that Mr. Shaggura had promised. Mr. Wilson was assigned two grade 12 advance college courses and three grade 9 English classes—in addition to Ms. Landsman's coverage duties that started outside the contractual start time.

30. Managing the teacher coverages/absences is an administrator's duty.

31. Managing the teacher absences/ coverage duties was especially stressful for Mr. Wilson because Mr. Wilson had to answer the phones, handle visitors, process coverages, and then switch gears to prep and teach his five class periods—a reality Mr. Shaggura had failed to inform Mr. Wilson of or failed to consider in terms of contract compliance and equity.

32. Consequently, Mr. Wilson experienced extreme hardship and health complications because of the added incompatible responsibilities. Mr. Wilson's bladder disability got worse because he could not leave the main office to use the restroom in a timely manner.

33. No other ELA teacher (all Caucasian and female) at Gorton had the course schedule and added duties that Mr. Shaggura gave Mr. Wilson during the 2019-2020 school year, and this shows a clear difference in treatment between Mr. Wilson and his female counterpart.

34. Mr. Shaggura discriminated against Mr. Wilson on the basis of Mr. Wilson's race, gender, and sex when he treated Mr. Wilson differently from Mr. Wilson's white female counter part.

35. Ms. Potter (an ELA teacher) taught 4 periods because she is a White female teacher. Ms. Potter was routinely covered out of her classes so that she could perform non-teaching duties assigned.

36. Managing the teacher absences/ courage duties begins prior to the school's contractual start time. However, although Ms. Landsman received several forms of accommodations for

arriving before the contractual start time—e.g., she was not assigned to teach any class during first period, and she was allowed to leave work early—no such accommodation or consider was given to Mr. Wilson.

37. When Ms. Ahn, a fellow non-tenured teacher at the relevant time, took over the teacher absences/coverages management duties, Mr. Shaggura made sure to provide her with accommodations, or her schedule was already structured, to allow her to work with more ease than Mr. Wilson. Ms. Ahn had four periods with three straight periods off from teaching, and she was frequently relieved from teaching her other periods to accommodate P-tech duties.

38. Both Ms. Ahn and Ms. Landsman were also allowed to leave work early, a privilege not extended to Mr. Wilson when he performed the same teacher absence/coverage duties with more classes, two advanced college courses, and multiple grades. Ahn taught 9th grade classes and Landsman taught zero classes. Ahn has only taught 9th grade at Gorton.

39. During the June 2019 conversation with Mr. Shaggura about Mr. Wilson taking over Ms. Landsman's teacher absences/coverage duties, Mr. Shaggura stated that he wanted to give Ms. Ahn the teacher absences/coverage duties but that he had to consider her babies at home and the hardship it would cause her.

40. Because Mr. Wilson is a Black male (race and gender), Mr. Shaggura did not extend the same consideration to Mr. Wilson regarding Mr. Wilson's parental responsibilities to his three children when considering the coverage management duties, he assigned to Mr. Wilson.

41. Some female teachers had laptop carts delivered to their rooms. In fact, the laptop cart assigned to Mr. Wilson for several years was brought from the first floor to the basement

and issued to the female teacher in room 19, the room next to his (November 20, 2019, email with AP Morales). When Mr. Wilson asked for said laptop cart, he was told to help the APs bring a cart from the second floor to the basement to his room. Mr. Wilson's back has not been the same since he helped bring the massively heavy laptop cart with 30 laptops down three flights of stairs. No female teacher was asked to do the same and none would be asked because of their gender and race.

42.   Mr. Wilson appealed to Mr. Ramirez to remove one of his classes, because Mr. Ramirez had scheduling responsibility. No help was rendered; no change made.

43.   On September 10, 2019, Mr. Wilson repeated to Mr. Ramirez that, "I cannot manage the coverage duties with my 5 periods." Mr. Wilson expressed that he was "having anxiety because of the overwhelming nature of managing coverages along with 5 periods and two grade levels." Mr. Wilson expressed that it was "unfair" that Ms. Ahn his female counterpart and fellow non-tenured teacher had only 4 teaching periods with no AA duties while he was teaching five classes with the added duties of managing teacher absences/coverages. Mr. Wilson expressed that "it did not look good nor feel right because it appears to be gender bias."

44.   Following the conversation with Mr. Ramirez on September 10, 2019, Mr. Shaggura's secretary (Ms. Laisha Lynk) came to Mr. Wilson's classroom 15 minutes before the start of the second period class and asked Mr. Wilson to report to Mr. Shaggura's office.

45.   On entering Mr. Shaggura's office, Mr. Wilson saw Mr. Ramirez with a yellow notepad, and Mr. Shaggura was visibly very upset. There was no union representative present nor was Mr. Wilson given the opportunity of getting union representation.

46.   On seeing Mr. Wilson, Mr. Shaggura began raising his voice and berated him for not being

able to manage the teacher absences-coverage duties.

47. When Mr. Wilson tried to explain the challenges he was facing—5 periods, two grades, 2 college courses, 2 additional observations by Syracuse University, his health issues—Mr. Shaggura threatened, "I will be coming to observe your lessons to see what you are doing."

48. Mr. Wilson expressed that it was gender bias to require him to take on managing staff coverage duties in addition to teaching 5 periods with two 12th grade college courses and 3 regular grade 9 classes—while Ms. Ahn only had 4 periods. (Other female teachers also had only four periods).

49. Mr. Wilson asked Mr. Shaggura to remove one of the 5 classes similarly to what he done for Ms. Ahn [and others], so that things would be manageable for Mr. Wilson.

50. Mr. Shaggura responded, "Effective immediately, I am relieving you of the coverage responsibilities." "You are expected to train Ms. Ahn for the next two weeks."

51. From 2019 to 2021, Mr. Shaggura gives certain female teachers around him 3-4 periods of teaching periods to ensure, nurture, and support their success in carrying out their duties; Mr. Wilson was denied and excluded from similar treatment and when he asked for similar treatment, Mr. Shaggura retaliated.

52. Ms. Keri Romanino was given 3 class periods during 2020-2021 to ensure that she receives full and proper internship experience.

53. Year after year, the same female teachers receive 3-4 four teaching periods: Ms. Potter, Ms. Fanek, and Ms. Ahn. And they are frequently pulled away from their teaching responsibilities to do tasks that the four administrators should have done.

54. Although Mr. Wilson raised discrimination in the September 10, 2019, meeting, Mr. Shaggura did not provide him with information or the internal grievance form to file a

8

grievance. Mr. Shaggura promptly retaliated instead.

55.    On September 12, 2019, Mr. Shaggura scheduled a meeting with the non-tenured teachers, including Mr. Wilson, during Mr. Wilson's lunch period, 4th period. Mr. Wilson was the only non-tenured teacher whose lunch period was during 4th period. As a consequence of requiring Mr. Wilson to attend the meeting during his lunch, Mr. Wilson taught or was in a meeting consecutively - 2,3,4,5,6,7 - without a break to use the restroom or eat. This pattern was repeated several times throughout the years.

56.    Mr. Shaggura discriminated against Mr. Wilson on the basis of Mr. Wilson's race and gender when he denied Mr. Wilson similar and comparable internship experience that he gave others, especially two of the female teachers mentioned above (Ms. Ahn and Ms. Romanino), and one male teacher (Mr. Chyrail who shares Mr. Shaggura's regional background).

57.    Although Mr. Wilson had asked Mr. Shaggura several times for internship experience, Mr. Wilson did not receive any internship experience with Mr. Shaggura and this stymied Mr. Wilson's growth compared to Ms. Ahn and Ms. Romanino's growth under Mr. Shaggura's tutelage.

58.    During Mr. Shaggura's principalship at Gorton, four teachers signed up for internship at Gorton and Mr. Wilson was the only Black teacher compared to Ahn, Romanino, Chyrail that Mr. Shaggura did not work with for internship experience.

59.    Because Mr. Shaggura denied Mr. Wilson similar and/or comparable internship experience that he provided White female teachers and teachers sharing his national origin, Mr. Wilson received an incomplete for his internship. None of the White teachers who interned at Gorton with Mr. Shaggura received an incomplete.

60.   Mr. Wilson asked Mr. Shaggura several times to allow him to work with Mr. Grandoit to receive needed leadership experience to compensate for what Mr. Wilson did not receive during the district-approved and college-supervised internship period. Needless to say, Mr. Shaggura did not offer an affirmative response. Ms. Romanino, however, gained internship experience with Mr. James, Mr. Shaggura, Mr. Grandoit, and Mr. Ramirez.

61.   Even after denying Mr. Wilson internship experience, Mr. Shaggura offered Mr. Wilson's White female counter-part Ms. Ahn and Ms. Romanino extended internship experience well-beyond the allotted time. This practice is continuing for other White female teachers.

62.   Providing only White female teachers with internship experience while excluding Mr. Wilson ensured these White teachers' success while ensuring Mr. Wilson's failure and reducing Mr. Wilson's chance of being hired as an assistant principal.

63.   In response to Mr. Wilson raising gender bias in September 2019 and his saying that he did not receive proper internship experience at Gorton when compared to Ms. Ahn, Mr. Shaggura placed Mr. Wilson at the main desk the whole 2019-2020 school year to perform safety-related duties up to 7:35 am, outside the contractual time in violation of the collective bargaining agreement.

64.   During the 2018-2019 school year when Mr. Wilson coordinated the MBK program, on one occasion, Mr. Shaggura mimicked Mr. Wilson's Jamaican accent in a comical and exaggerated manner. This took place while Mr. Wilson was waiting with students for transportation to take them to school 16 for a MBK event. Mr. Wilson was deeply offended and embarrassed.

65.   Mr. Shaggura showed racial animus to several Black/African American Educators.

66.   Ms. Amy Paci is a White female teacher and Department Representative of the Math

department at Gorton High School. At relevant times, Ms. Amy Paci's individual and department test scores were lower than Mr. Haughton's (black-male-Jamaican). However, Mr. Shaggura did not attempt to remove Ms. Paci as Department Representative, despite the failing grades, as he had attempted to do with Mr. Haughton.

67. Mr. Shaggura was so upset with Mr. Bannister (African American safety officer) during a MBK meeting in his office, so much so that after Mr. Bannister left the room, Mr. Shaggura cursed him using profanity (the "f-word"). Mr. Bannister was ultimately transferred from Gorton. But, while Mr. Bannister was at Gorton, it was clear that he had a difficult relationship with Mr. Shaggura.

68. Mr. Shaggura also removed, contributed to the removal or transfer of, the following Black staff at Gorton: Ms. Williams (AP), Robert (Custodian), Ryan James (AP), and Ms. Fleck (Special Ed Teacher). A similar mass exodus is not seen in the other ethnic groups at Gorton, specifically the White and Arabic staff.

69. Mr. Shaggura oversees several school development/operation groups/teams at Gorton. However, there is not one active Black/African American teacher on any of those teams. Mr. Haughton used to be rather active at Gorton when Ms. Joyner was principal. However, after Mr. Shaggura became principal, Mr. Haughton was completely marginalized, excluded, and—based on Mr. Wilson's direct knowledge-- Mr. Shaggura attempted to remove Mr. Haughton as chair/Department representative of the Science Department.

70. Mr. Shaggura wrote Mr. Wilson's probationary teacher summary for the 2019-2020 school year. The probationary summary was devoid of anything that showed that Mr. Wilson was, indeed, a highly effective teacher at Gorton for several years and that Mr. Wilson had designed and delivered several PDs throughout the school year as well as taught two

advance English college courses through Syracuse University. Instead, the probationary summary contained several inaccuracies and it painted Mr. Wilson as a mediocre teacher at best.

71.   Mr. Shaggura has never observed Mr. Wilson during Mr. Wilson's years at Gorton, but Mr. Wilson provided every observer with his data gathering spreadsheet that provided Mr. Wilson the entrée to collect, analyze, and lead with student data. In contrast, Mr. Shaggura wrote both Ms. Ahn and Fanek's probationary summary and he ensured that their accomplishments were fully and accurately highlighted and that the document reflected their true abilities and successes; Mr. Shaggura did the opposite for Mr. Wilson.

72.   Although Mr. Wilson is older than Mr. Shaggura, Mr. Shaggura tends to shout at Mr. Wilson, cuts him off during mid-sentence by saying "just get to the point," and ignores Mr. Wilson's emails.

73.   Mr. Wilson properly submitted paperwork to attend a mandated training course at Syracuse University. However, Mr. Shaggura approved Ms. Landsman's coding Mr. Wilson's absence-for-training as a "personal day." Mr. Wilson takes pride in having a perfect attendance record and was never absent during his probationary period except to attend school-required training. However, despite Mr. Wilson pointing out these discrepancies to clear up the record—given Mr. Wilson's leadership aspiration within the District—Mr. Shaggura did not make any change to the negative record he had created and submitted to the District to become a part of Mr. Wilson's permanent record.

**2020-2021 SCHOOL YEAR**

74.   Mr. Shaggura retaliated against Mr. Wilson because he sent complaints to the District and Board outlining discrimination and retaliation; Mr. Shaggura's retaliation was ongoing,

and it created a hostile environment.

75. On account of the above experiences and others that Mr. Wilson witnessed at Gorton or that were relayed to him by several teachers, in around September 2020, October 1, 2020, and November 1, 2020, Mr. Wilson sent extensive discrimination complaints to the District to seek help in alleviating the unbearable conditions at Gorton.

76. In response to Mr. Wilson's September 2020 and October 2020 complaint, Superintendent Quezada canceled an appointment he had so eagerly set up with Mr. Wilson to discuss leadership opportunities.

77. On November 1, 2020, Mr. Wilson sent another complaint to Superintendent Quezada and the District detailing additional examples of discrimination.

78. At approximately 2:37 pm on November 6, 2020, Mr. Shaggura confronted Mr. Wilson in the stairwell about the above referenced letter that Mr. Wilson sent to the District.

79. Mr. Shaggura confronted Plaintiff about a discrimination complaint he sent to the District and stated, "But why did you send a complaint to the district?"

80. To Mr. Wilson's dismay, on the next school day, November 10, 2020, Mr. Shaggura retaliated against Mr. Wilson by giving him a coverage during the very same 8th period that Mr. Wilson had told Mr. Shaggura he was using to meet the learning needs of the students.

81. From the beginning of the 2020-2021 school year, Mr. Wilson's 8th period was designated for him to work with Mr. Grandoit (AP), Mr. Dolce, Mr. Texler, and Ms. Romanino on school-wide curriculum development. The schedule should have reflected that Mr. Wilson's 8th period was designated for work on the curriculum team—because Mr. Grandoit had told Mr. Wilson that his 8th period would be used for curriculum and PD development.

82. After Mr. Wilson was issued a coverage during the 8th period, Mr. Wilson was never called to participate in another curriculum team meeting with the group for the rest of the school year.

83. On November 10, 2020, Mr. Wilson engaged in protected activity when he emailed Mr. Shaggura about the sudden change to his administrative assignment that would obstruct him from working on the curriculum team.

84. When compared to previous AA schedules, "Rev. 11/09/2020" schedule shows that, on Nov 9th, 2020, my 8th period AA was abruptly changed, and Plaintiff was placed on "MOBILE 2ND FLOOR duties during my 8th period AA. Prior to this abrupt change, he was not listed on the AA schedule.

85. On November 10, 2020, when the schedule actually went into effect, Plaintiff was given an assignment to cover a class during 8th period; prior to this coverage, he received no coverage assignment because his 8th period AA was blocked out to work on the curriculum development/PD team.

86. On November 9, 2020, AP Grandoit informed Mr. Wilson that he would be performing guidance-related work with him (checking transcripts).

87. Mr. Wilson timely applied for ADA accommodation in August 2020 for the 2020-2021 school year, but neither the District nor Mr. Shaggura bothered to respond to Mr. Wilson after he engaged in protected activities in September 2020, October 2020, and November 2020. Consequently, Mr. Wilson disability was acerbated.

88. During staff meeting, Mr. Shaggura would only praise Dolce, Kreamer, and Texler for their work on Nearpod and Teams training; however, Mr. Wilson was overlooked. Even though Mr. Wilson had designed and taught Mr. Dolce and other teachers a way to use Teams to

effectuate proper classroom management, no public recognition was given to Mr. Wilson due to retaliation. Several teachers approached to ask why Mr. Shaggura was not giving Mr. Wilson the same acknowledgement for his contributions to Gorton.

89.  Mr. Shaggura was also considerate of Ms. DeMatteo when he reduced her 5 ELA classes to four and transferred her students to Mr. Wilson's classes. The justification was that she was working on senior-related matters. However, when Mr. Wilson taught 5 periods, two grades, two college courses, managed teacher coverages, participated in ongoing MBK events, and was expected to teach credit recovery, no such consideration was given to Mr. Wilson.

90.  Prior to Mr. Wilson's complaint to the district and board, Mr. Wilson was told that, because he was one of the trainers at Gorton, he would receive a Promethean board. Mr. Dolce, Ms. Fanek, and other teachers received a Promethean board; Mr. Wilson received none, because of his complaint to the district and Board.

91.  Mr. Wilson requested the following items to help his SUPA college students succeed: a pen tablet and ink for the printer in his room. Although Mr. Morales (AP) was engaged in a "spend-down" effort before the end of the fiscal year, Mr. Wilson's requests were denied. However, non-college-course teachers received items in support of their success. The lack of support shown to Mr. Wilson is a form of retaliation that negatively impacted his students' education.

92.  Mr. Wilson asked Mr. Morales for a laptop stand to alleviate neck and back pain due to the long hours Mr. Wilson was spending reading and grading lengthy college level papers for his SUPA students. This request was denied.

93.  Mr. Grandoit is the only Black/African American/Afro-Caribbean Assistant Principal at

Gorton.

94.    Mr. Shaggura is Arabic and identifies as White.

95.    Mr. Jamie Morales identifies as Caucasian.

96.    Mr. Ramirez identifies as Puerto Rican.

97.    Mr. Shaggura retaliated against Mr. Wilson because he took two sick days to comply with a COVID-mandated quarantine and a medical doctor's quarantine order.

98.    Mr. Wilson promptly notified Mr. Shaggura via email of his quarantine order. Mr. Wilson informed Mr. Shaggura that he would connect with the students from home to ensure continuity of instruction.

99.    After quarantining for two days, Mr. Wilson received a negative COVID result. Therefore, Mr. Wilson promptly returned to work. Mr. Wilson later found out that he should have been quarantined for more days. Needless to say, he was too eager to return to his students.

100.   Despite Mr. Wilson not taking the required 14 days in quarantine and despite his teaching his students remotely during the two quarantine days, Mr. Shaggura still issued a negative attendance letter dated November 20, 2020, fourteen days after confronting Mr. Wilson about his November 2020 complaint letter to the district and board.

101.   Although Mr. Shaggura's November 20, 2020, negative attendance letter shows code "CVQ" meaning COVID related per the code legend, Mr. Wilson was still issued a negative attendance letter (a disciplinary letter).

102.   Ms. Potter, Ms. Paci, and other teachers took extended COVID/medical-related leave, but none received the negative letter that Mr. Shaggura issued Mr. Wilson.

103.   The negative attendance letter was retaliatory—given its proximity to Mr. Wilson's complaints (November 1, 2020, to the District and November 10, 2020, to Mr. Shaggura)—

and it was also discriminatory.

104. Mr. Wilson was the only teacher in the department teaching two college courses and the only teacher assigned to teach two grades. When Mr. Wilson expressed to Mr. Shaggura that the three grade 9 and two grade 12 classes were two high-need grades and that the grade 12 students were functioning 1-2 grades levels lower, he shot back that Mr. Wilson should be able to teach two grades. Mr. Shaggura said Mr. Wilson's expertise was needed to "lay foundation for the 9th graders and prepare the 12 graders for college."

105. On February 24, 2021, Mr. Shaggura told Mr. Wilson he would become the next Chair of the ELA Department.

106. Mr. Wilson left the aforementioned February 24, 2021, meeting believing Mr. Shaggura because, weeks earlier, on February 12, 2021, Mr. Wilson received an email from Ms. Judon-Collins (assistant superintendent) that reads: "I look forward to Dr. Quezada's review of your work and next step."

107. However, on around June 2, 2021, Mr. Shaggura reneged on his promised and required Mr. Wilson to complete a survey nominating the next ELA Chair.

108. On June 2, 2021, Mr. Wilson clearly engaged in protected activity when he responded to the pretextual-survey that Mr. Shaggura asked him to complete by stating that Mr. Shaggura had promised him the chair position and that the White teachers would not nominate him, a Black man.

109. Mr. Wilson's survey responses included direct references to his race and gender and alluded to evidence that was already shared with the District, the Board of Education, and with Mr. Shaggura during a February 24, 2021, meeting.

110. On June 7, 2021, Mr. Wilson was called into a disciplinary meeting during which Mr.

17

Shaggura took serious issue with Mr. Wilson saying the survey process was unfair and Mr. Wilson's references.

111. Mr. Shaggura's framing of Mr. Wilson's protected activity via the survey was geared to tarnish Mr. Wilson's reputation with the District by stating that Mr. Wilson was calling his colleagues racists.

112. Mr. Shaggura's tone and statements made clear that the June 7, 2021, meeting was a disciplinary meeting to chastise Mr. Wilson for having engaged in a protected activity via the survey and to ensure that Mr. Wilson would not do it again.

113. The survey was clearly a protected activity that Mr. Shaggura should have forwarded to "HR and the legal team" because Mr. Wilson's statements in the survey echoed what he shared with Mr. Shaggura on February 24, 2021.

114. On February 24, 2021, Mr. Shaggura stated that Mr. Wilson will "definitely" get the ELA Department Representative position and that it was a "done deal." Mr. Shaggura stated: "You will get the Department Representative position with added responsibilities." Mr. Shaggura also stated, "You have got to toughen up."

115. On February 5, 2021, Mr. Wilson applied for the Title I Executive Director position based mainly on the representation that he would have received the position.

116. However, on May 21,2021, Mr. Wilson received a letter from Dr. Quezada stating that the Title I position was filled.

117. During the June 7, 2021, disciplinary meeting, Mr. Shaggura made an admission that he did promise Mr. Wilson the ELA Department Representative Position. He also made this admission in an email to Mr. Wilson. The reason Mr. Shaggura changed his mind was due to discrimination and retaliation.

18

118.  Shortly after Mr. Wilson received Dr. Quezada's letter, Mr. Shaggura sent out the June 2, 2021, survey and the survey was followed by disciplinary action against Mr. Wilson on June 7, 2021.

119.  On June 10, 2021, Mr. Shaggura made a statement to the effect that given that you have alleged discrimination against Gorton, I was asked to provide you with this, and he handed Mr. Wilson papers in a folder. The manner in which this process was orchestrated was clearly meant to further intimidate Mr. Wilson.

120.  Mr. Shaggura's decision not to promote Mr. Wilson to the ELA Department Representative/Chair position was based on discrimination and retaliation.

121.  Mr. Wilson's complaint was handled differently from Ms. Catherine Marinello's (a White female) complaints in part because Mr. Wilson is Black

122.  However, Ms. Marinello, a white female teacher, was not disciplined or called into a disciplinary meeting the way Mr. Wilson and other Black teachers were treated.

123.  Mr. Shaggura did not extend the same opportunities, resources, and support to Mr. Wilson that Mr. Shaggura provided certain white female teachers.

124.  Mr. Shaggura also gradually removed Mr. Wilson from MBK in retaliation. This was so apparent when other MBK staff and students went on a planned trip without Mr. Wilson. Mr. Wilson was scheduled to attend the MBK trip and was waiting to hear an announcement. There was no announcement and they left without alerting Mr. Wilson.

125.  Mr. Shaggura provided no support or guidance when Mr. Wilson worked on MBK.

126.  Mr. Shaggura also ensured that Mr. Wilson's white female counterpart received compensation for work performed outside the scope of classroom instruction.

127.  Mr. Shaggura did not extend similar treatment to Mr. Wilson in terms of compensation.

Mr. Wilson was not compensated for the many hours spent outside of work on MBK-related work, PD development, Cross Curricular Initiative, and SUPA-related work. Mr. Wilson is yet to receive reimbursement for a mandated SUPA training he attended in New York City during the 2019-2020 school year.

128. When Mr. Wilson accepted the role of teaching the two college courses at Gorton, the agreement was for him to teach all grade 12 classes, not two grades, due to the challenges associated with teaching college courses to students who are functioning 1-2 grade levels lower and who needed targeted support to meet the rigor of the college courses.

129. For two consecutive years, Mr. Wilson was assigned to teach the most advanced courses to grade twelve students plus three 10th grade classes, whereas the white female teachers in the ELA Department only (or mostly) taught one grade. Some only taught four periods, as opposed to Mr. Wilson's five periods.

130. For the 2020-2021 school year, Mr. Shaggura gave Ms. Romanino only three class periods to teach. Whereas Ms. Romanino teaches one college class the whole year, Mr. Wilson teaches two separate college courses plus another grade for a total of 5 periods.

131. It has been a well-established practice at Gorton to have each grade level teacher teach one century honors class, which is comprised of students with 85% and above. In retaliation, during the 2020-2021 school year, Mr. Shaggura assigned both century honors classes to Ms. Marinello. Consequently, Mr. Wilson was not assigned any century honors class; he was assigned non-century honors students.

132. Mr. William Shaggura discriminated against Mr. Wilson based on Mr. Wilson's race, gender, sex, disabilities, national origin, and retaliation based on disparate and unequal treatment in terms of class assignments, duties, accommodations, opportunities to gain

overtime pay and compensation for duties performed outside contractual work time, discipline, comments, and internship/leadership opportunities.

133. Defendant discriminated against Blacks/African American educators by not providing and ensuring equal opportunity for them to obtain the training and mentorship given freely to non-Blacks that lead to their promotion.

134. Mr. Wilson complained to Superintendent Quezada about not receiving school building training per his agreement with the District, but his White and other non-Black colleagues at Gorton received said training and were subsequently promoted to assistant principal positions (Ahn and Romanino).

135. Mr. Quezada ignored Mr. Wilson's complaints and made no effort to ensure that Mr. Wilson received equity in terms of receiving school building training.

136. In fact, Mr. Quezada approved and/or directed actions against Mr. Wilson that removed/blocked him from activities that allowed for leadership experience (curriculum development team, PD team, MBK, etc.).

137. In September 2021, Mr. Wilson was re-assigned from the PD and curriculum teams to do "shit duty" which included simultaneously covering both the male and female student restrooms at Gorton.

138. For the 2021-2022 school year, Mr. Wilson was denied the opportunity of having a scheduled common planning time with his grade level teacher as was provided to every other ELA teacher to ensure their success. AP Stein tried to compensate for this anomaly by telling Mr. Wilson and Ms. Ellis to hold planning meetings in front of the restrooms while Mr. Wilson simultaneously monitored two restrooms.

139. In around June 2021, Mr. Shaggura released private and confidential information about

Mr. Wilson's complaint to his colleagues who weaponized this information to ostracize and bully Mr. Wilson; the chair of Mr. Wilson's ELA Department (Ms. DeMatteo) called him "the motherfucker" and teachers were told not to speak to him.

140. In around late June 2021, Mr. Shaggura disclosed Mr. Wilson's complaint to Ms. Potter and Ms. Marinello who in turn filed allegations of stalking and discrimination against Mr. Wilson—all of which were investigated and dismissed by HR.

141. Despite the dismissal of the false allegations against Mr. Wilson, his colleagues continued to spread rumors that he stalked teachers in his department and the District/Superintendent Quezada continued to ignore Mr. Wilson's cries for help.

142. Ms. Catherine Marinello filed serious allegations against a total of three Black educators at Gorton who had opposed Mr. Shaggura's discrimination.

143. Ms. Potter and Ms. Marinello's baseless allegations ruined Mr. Wilson's prospect of advancing within the District.

**2021-2022 SCHOOL YEAR**

144. On May 23, 2022, Mr. Wilson was denied a promotion to assistant principal because the decision "ultimately came down to a candidate that had many years of administrative experience." However, during relevant times, the District hired or promoted 27 candidates to assistant principal who lacked any administrative experience. Three candidates were hired without the required license (Morales, Ahn, and Shojai). And five (5) candidates were hired with COVID temporary license while Mr. Wilson was fully licensed from 2020.

145. On around May 24 or 25 of 2022, someone placed an image of a monkey on Mr. Wilson's desk, a racially demeaning image.

146. On May 24, 2022, Mr. Wilson filed a complaint with Superintendent Quezada, and, on

June 1, 2022, he replied: "I will be interested in meeting with you, your union representative and district counsel to discuss concerns relative to your situation."

147. On June 7, 2022, Mr. Wilson sought a leadership position from Superintendent Quezada, but Mr. Quezada steered him to "[transfer] from Gorton to an ELA position at another school" while at the same time promoting Ms. Ahn (Mr. Wilson's colleague) to assistant principal without her having the required license.

148. After Mr. Wilson complained to HR, on June 9, 2022, he received a letter from Yonkers Public Schools Personnel/Human Resources Dept that reads, "This letter is to inform you that since you are on leave, the District has made it possible for you to post for a position, in your tenure areas, online."   This letter was to intimidate and force Mr. Wilson into posting out of his current position, because Mr. Wilson was not on leave nor sought leave.

### 2022-2023 SCHOOL YEAR

149. The District would later succeed in forcing Mr. Wilson on leave and using this ploy to block his return to work on September 5, 2023.

150. On information and belief, as a continuation of bullying and ostracism, on April 5, 2023, staff within Yonkers Public Schools sent to Mr. Wilson's school email four emails containing disturbing and degrading gay pornography depicting Black men bearing Mr. Wilson's resemblance.

151. In April 2023, Mr. Wilson's teaching materials and personal items were tossed on a dump pile in the back of his classroom and over 25 items were discarded, stolen, or destroyed.

152. On May 8, 2023, Mr. Wilson submitted an application to the Yonkers Public Schools' Emergency Leave Benefit Program.

153. On May 9, 2023, Mr. Wilson filed an internal discrimination complaint against

Superintended Quezada.

154. On May 10, 2023, Superintendent Quezada/HR sent an email denying Mr. Wilson's Emergency Leave Benefit application and a copy of Mr. Wilson's discrimination complaint against Quezada was attached to the email.

155. Dr. Rabadi, the District doctor who approves Emergency Leave Benefit applications, sent Mr. Wilson an email on May 10, 2023, declaring that he did not deny Mr. Wilson's application—thereby implicating Superintendent Quezada as the agent of the denial.

156. Superintendent Quezada did not respond to Mr. Wilson's letter of appeal or request for an explanation of his denial letter.

157. Mr. Wilson also filed a new application for Emergence Leave Benefit in April 2023, but the District (Ted Von Hoene/HR) completely ignored his application.

158. Plaintiff had complained about the discriminatory practices and lack of advancement due to his race on numerous occasions including filing a notice of claim in May 2023.

159. Plaintiff was denied a promotion due to his race and retaliation and due to the discriminatory practice of Defendant.

160. Yonkers Public Schools placed Mr. Wilson on involuntary leave in December of 2022 and stopped his pay checks on May 7, 2023.

161. On June 15. 2023, two weeks after receiving Mr. Wilson doctor's note to return to work from leave of absence, Deputy Commissioner Ted Von Hoene called Mr. Wilson to say he had to transfer from his current position at Gorton.

162. There was a position available to wit, the Director of MBK. This job was advertised on the District website and other sites.

163. On June 23, 2023, Plaintiff duly applied for the position and met all the qualifications for

the position.

164. Plaintiff was never called for an interview. However, the District scheduled an interview with at least one candidate that did not even meet the requirements for the position. Upon information and belief, the individual who was hired was non-African American and had no prior EEO activity.

165. On June 2, 2023, Plaintiff complied with Yonkers Public School policy and directives by submitting a doctor's note that stated he was "cleared to return to work on June 25, 2023 to the following people: Jacqueline Hoffman (HR rep responsible for sick leave); Ted Von Hoene (Assistant Commissioner of HR); Tracey Kuzemczak (HR manager); Grace Macri (emergency fund rep); and Dr. Ammir Rabadi (Yonkers Public Schools Medical Doctor responsible for reviewing and approving matters relating to sick leave and return to work).

### 2023-2024 SCHOOL YEAR

166. No one responded to Plaintiff's June 2, 2023, email. Also, neither Dr. Ammir Rabadi nor anyone from Yonkers Public Schools contacted him to schedule a meeting with the doctor for him to be cleared to return to work by September 5, 2023.

167. On August 30, 2023, Plaintiff received an email from Yonkers Public Schools online absence management system showing that HR rep Josephine Fundales administratively placed Plaintiff on unpaid sick leave from 9/5/2023-10/31/23.

168. When Plaintiff checked Yonkers Public Schools online absence management system, it shows that Ms. Rosemary Rispo (a retired colleague of Plaintiff from Gorton HS who subbed at Gorton for the 2022-23 school) was assigned as the permanent sub for his classes.

169. On August 31, 2023, Plaintiff contacted Josephine Fundales in HR about her assigning a sub to his classes. He told her that he was planning to report to work. She said she "was

requested to put a sub." "They need me to put a sub for your class."

170. On August 31, 2023, Plaintiff wrote HR commissioner Carlos Moran, Assistant Commissioner Ted Von Hoene, and Superintendent Rodriquez to express that "No one has contacted me concerning my situation at Gorton, my employment status, and matters concerning my returning to work." Plaintiff wrote that, "in the interest of ensuring that I am not accused of abandoning my job and in the interest of having a paycheck to survive (avoid eviction), I have no recourse but to report to Gorton unless I am advised otherwise. I have complied with legal obligations and YPS' policies regarding sick days, medical notes, etc.").

171. On September 5, 2023, Plaintiff reported to work/Gorton HS on the first day of work, given that no one responded to him to state otherwise. Principal Morales approached Plaintiff in the cafeteria where all the teachers were gathered for pre-service training. He stated that Plaintiff was not cleared to return to work. Plaintiff told him there must have been a mistake because he submitted all required paperwork and complied with all-stated directives. Principal Morales stated that Plaintiff was not allowed in the building and that he should leave immediately and thus he had to leave the building.

172. Plaintiff had complained about Principal Morales to DHR pertaining to sex discrimination, ADA, and retaliation and in his prior notice of claim.  At 4:32pm on September 5, 2023, HR Assistant Commissioner responded to Plaintiff's email to say, "Hi Stephen – to return to work, you would need a doctor's note that would be reviewed by Dr. Rabadi for clearance" However, Mr. Wilson's attached doctor's note was emailed to  Mr. Von Hoene and Dr. Rabadi over three (3) months ago.

173. The District failed to follow a normal course of action that required the District to place

Mr. Wilson into an available ELA position at Roosevelt or in the Vive Program on or before September 5, 2023.

174. Due to the District's action in placing Mr. Wilson on unpaid medical leave, blocking his return to work on September 5, 2023, and removing Mr. Wilson from work on September 5, 2023, Mr. Wilson and his family were out of insurance coverage and a paycheck for several months.

175. After taking the aforementioned adverse actions against Mr. Wilson, the District went one step further:  The District denied Mr. Wilson's workers compensation claim for the same illness that the District used to place Mr. Wilson on unpaid, involuntary leave.

176. Mr. Wilson was finally allowed to return to Gorton on October 31, 2023, with no laptop to deliver his lesson, no office stationery, a broken promethium board that blinks on and off, and a broken-off-back orthopedic chair heavily stained with semen or body fluid.

177. Students reported that Mr. Wilson's classroom and belongings were left unsupervised and unprotected during his involuntary leave of absence, and as a consequence, students routinely had intercourse in Mr. Wilson's classroom.

178. On Mr. Wilson's return to Gorton on October 31, 2023, AP Cassano visited Mr. Wilson's room to welcome him back. Mr. Wilson stated that he had reported to work on September 5, 2023, to which Mr. Cassono responded: "I heard there was a spotting," referring to the onset of unwanted or unexpected mensuration.

179. Students are allowed to physically attack Mr. Wilson causing severe injury yet receiving no consequences: on December 1, 2023, a student willfully struck Mr. Wilson with a door and cursed at him. On December 12, 2023, two students engaged in an altercation in Mr. Wilson's classroom. And, in both incidents, no disciplinary action was taken.

180. On December 6, 2023, Mr. Wilson emailed AP McClary regarding the lack of follow-through on the December 1, 2023, student-attack-incident, and Ms. McClary told Mr. Wilson to climb stairwell five to remove students, a violation of an ADA agreement with the District.

181. For three consecutive school year (2021-2022, 2022-2023, and 2023-2024), Mr. Wilson was assigned to a "hot zone" (highly volatile) location (ground floor bathroom and stairwell 5) for his AA duty, an assignment not given to others and not in alignment with past practices.

182. As a result of the foregoing, intentional continuing discrimination and retaliation, the District violated Title VII, 42 U.S.C. 1981, and the Executive Law § 296, by discriminating against Plaintiff due to his race. Plaintiff has been subjected to an ongoing, continuous, intentional pattern of race discrimination and retaliation that has created a hostile work environment and disparate treatment.

183. The above conduct is intentional, willful, deliberate and continuous conduct that is a pattern of race, gender and national origin discrimination and retaliation.

184. At all times relevant, Plaintiff performed his job responsibilities in an exemplary manner.

185. It has been necessary for Plaintiff to engage the services of an attorney to file and prosecute this action, and thus also request attorneys' fees.

186. Plaintiff duly served a notice of claim, a statutory 50H statutory hearing was held and more than 30 days have elapsed without the claim being adjusted by the District.

### FIRST CLAIM FOR RELIEF-TITLE VII—YPS ONLY
### RACE-NATIONAL ORIGIN AND GENDER

187. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with

the same force and effect as it more fully set forth herein.

188. Based upon the foregoing, the Plaintiff has been subjected to a hostile work environment, disparate treatment and otherwise discriminated against based on his race, national origin and gender in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e et. seq.

189. Defendant acted maliciously, wantonly, and in conscious disregard of Plaintiff's rights and Defendant's statutory obligations and as a result, Plaintiff has been damaged.

## SECOND CLAIM FOR RELIEF-YPS ONLY
### TITLE VII-RETALIATION

190. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as it more fully set forth herein.

191. Based upon the foregoing, the Plaintiff has been subjected to a hostile work environment, disparate treatment and otherwise based on retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e et. seq.

192. Defendant acted maliciously, wantonly, and in conscious disregard of Plaintiff's rights and Defendant's statutory obligations and as a result, Plaintiff has been damaged.

## THIRD CLAIM FOR RELIEF-YPS ONLY
### 1981-RACE

193. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

194. 42 U.S.C. § 1981 states in the relevant part as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal

benefit of all laws and proceedings for the security of persons and
property as is enjoyed by white citizens, and shall be subject to like
punishment, pains, penalties, taxes, licenses, and exactions of every
kind, and to no other.

195. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981, by

discriminating against Plaintiff because of his race (Black).

196. Plaintiff was subjected to negative disparate treatment, discrimination, humiliation,

embarrassment, adverse employment actions due to his race.

### FOURTH CLAIM FOR RELIEF-YPS ONLY
### 1981-RETALIATION

197. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

198. By the acts and practices described above, Defendants retaliated against Plaintiff for his

opposition to unlawful discrimination under 42 U.S.C. §1981.

199. Defendants acted with malice and/or reckless indifference to Plaintiff statutorily protected

rights.

200. Plaintiff is entitled to the maximum amount of damages allowed under this statute.

### FIFTH CLAIM FOR RELIEF-NYSHRL-ALL DEFENDANTS
### RACE-NATIONAL ORIGIN, AND GENDER

201. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the

same force and effect as it more fully set forth herein except paragraphs numbered 68 and

72 pertaining to Plaintiff's actual termination.

202. As a result of the foregoing intentional continuing discrimination the Defendant violated

Executive Law § 296, by discriminating against Plaintiff due to his race, national origin,

and gender. As a result of the foregoing, Plaintiff was subjected to disparate treatment and

a hostile work in violation of the NYS Executive Law 296 et. seq.

203. As a result of Defendant violating the NYSHRL, Plaintiff has been damaged.

## SIXTH CLAIM FOR RELIEF-NYSHRL-ALL DEFENDANTS
### RETALIATION

204. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above

with the same force and effect as it more fully set forth.

205. As a result of the foregoing intentional continuing discrimination the Defendant violated

Executive Law § 296, by discriminating against Plaintiff due to his race, national origin,

and gender. As a result of the foregoing, Plaintiff was subjected to disparate treatment and

a hostile work in violation of the NYS Executive Law 296 et. seq.

206. As a result of Defendant violating the NYSHRL, Plaintiff has been damaged.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury of all issues and claims in this action.

## JURY DEMAND

### PLAINTIFF HEREBY DEMANDS A JURY TRIAL.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendants engaged in unlawful employment practices prohibited

by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New York

State Human Rights Law, Defendants discriminated against Plaintiff based on

Plaintiff's race, national origin, gender and retaliated against Plaintiff due to his

multiple complaints of discrimination and created a hostile work environment;

B. Awarding damages to Plaintiff resulting from Defendant's unlawful harassment,

discrimination, retaliation, and conduct and to otherwise make Plaintiff whole for

any losses suffered because of such unlawful employment practices including but not limited lost pay;

C.   Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.   Awarding Plaintiff prejudgment interest;

E.   Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.   Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       January 9, 2024

STEWART LEE KARLIN
LAW GROUP, P.C.

STEWART KARLIN, ESQ.
*Attorneys for Plaintiff*
111 John Street, 22nd Floor
New York, NY 10038
Tel: (212) 792-9670
slk@stewartkarlin.com